**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ATKINSON DREDGING COMPANY, Respondent.**

**No. 9090.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 7, 1963.

Decided Feb. 24, 1964.

Certiorari Denied June 8, 1964.

See 84 S.Ct. 1647.

Joseph C. Thackery, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Atty., National Labor Relations Board, on brief), for petitioner.

George H. Revercomb, Washington, D. C., and Hugh S. Meredith, Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for respondent.

Before HAYNSWORTH and J. SPENCER BELL, Circuit Judges, and CRAVEN, District Judge.

J. SPENCER BELL, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order that Respondent, Atkinson Dredging Company, collectively bargain with the International Union of Operating Engineers, Local Union 25, Marine Division AFL-CIO [hereinafter the Union], as the certified representative of Respond-

ent's employees.[1] Respondent's admitted refusal to bargain is based on its contention that the Board improperly certified the Union after erroneously permitting ineligible former employees to vote in the representation election of May 4, 1961.

Respondent, a Florida corporation with its principal place of business at Great Bridge, Virginia, is engaged in marine construction and land reclamation between the eastern shore of Virginia and Key West, Florida. Respondent operates intermittently three dredges (the Enterprise, the Northwood, and the Hampton Roads), and hires workmen to operate these dredges, with the exact number employed dependent upon the available work. Upon application of the Union and after a representation hearing, the Board directed an election to be held on May 4, 1961, among "all employees of Respondent engaged in dredging operations" employed during the payroll period ending April 1, 1961.

At the election a total of thirty-five employees presented themselves to vote, including twenty-two employees whose names were not on Respondent's eligibility list. In accordance with Board policy, the ballots cast by these twenty-two men were challenged by the Board agent. Of the unchallenged ballots, five were for the Union and eight against. Since the challenged ballots were sufficient in number to affect the results of the election, the Regional Director conducted an investigation and directed that a hearing on the challenged ballots be held on September 19 and 26. Respondent was present and participated in the hearing. On October 27, the hearing officer issued his Report on Challenges, recommending that eight challenges be sustained and that fourteen be overruled and the ballots counted. Respondent filed exceptions to the recommendation that ten challenges be overruled, but made no exceptions to the remaining four. In a Supplemental Decision and Direction issued on April 11, 1962, the Board upheld the hearing officer's recommendation that fourteen of the challenged ballots be counted, but reversed the hearing officer's recommendation that the challenge to the ballot of one Floyd Hewitt be sustained. Thus, fifteen additional ballots were added to those already counted, resulting in a union victory of fifteen to thirteen.

Respondent's consistent position has been that ten ballots were cast by former employees who had been severed from the Company payroll without "reasonable expectation of employment within a reasonable time in the future." Whiting Corp. v. N. L. R. B., 200 F.2d 43, 45 (7 Cir. 1952). Respondent argues that the dredging business is subject to fluctuations and that no new dredging contracts may be obtained for an indefinite future period. It also argues that the Company more often than not hires local personnel at the sites of the dredging jobs obtained and that consequently there is no substantial continuity among its employees. On these grounds, Respondent reasons that the certification of the Union was improper (based as it was on ballots cast by permanently laid off employees) and, therefore, Respondent cannot be charged with a refusal to bargain. Pittsburgh Plate Glass Co. v. N. L. R. B., 313 U.S. 146, 154, 61 S.Ct. 908, 913, 85 L.Ed. 1251 (1941); American Federation of Labor v. N. L. R. B., 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940).

Upon a review of the whole record we find that the Board's determination to the contrary is supported by substantial evidence. In the Board's decision and order of April 15, 1963, in the complaint

---

1. The Board's order was based on a finding that Respondent had violated §§ 8(a) (1) and (5), 29 U.S.C. 158(a) (1) and (5):
"§ 158. Unfair labor practices
"(a) It shall be an unfair labor practice for an employer—
"(1) [T]o interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
\* \* \* \* \*
"(5) [T]o refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

case, the prior certification was considered and reaffirmed. Thus in ruling that Respondent had committed an unfair labor practice the Board necessarily found that no ineligible former employees had voted in the representation election of May 4, 1961. In this we concur. Since Respondent only contests the counting of ten of the fourteen challenged ballots, we must assume that the remaining four were properly counted. Of the contested ten, Respondent takes exception to one on the ground that the employee casting the ballot had been injured in February and was not working on either the eligibility date, April 1, or the date of the election, May 4; to two others on the ground that they were employed neither on the eligibility date nor on the date of the election; and to seven others on the ground that while employed on the eligibility date, they were laid off prior to the election date without a reasonable expectation of recall.

### WALTON GILLIKIN

The record reveals that Walton Gillikin was working for Respondent on the Hampton Roads dredge in February, 1961. On February 11, he injured his finger and was sent to a doctor for treatment by the Captain of the Hampton Roads. Walton Gillikin stayed at home approximately a month, allowing his finger to heal, and then twice sent word back to the Captain—once by a fellow employee and once by the Captain's brother—that he was ready to return to work. Walton Gillikin was not recalled by Respondent, and accepted employment with a plumbing company sometime after the eligibility date of April 1, but prior to the election date of May 4. This job lasted approximately six or eight weeks and he then accepted other employment.

The informal practice utilized by Respondent's laid off employees of sending word back by fellow employees when they are ready to return to work is a procedure recognized and accepted by both employees and responsible company officials. Walton Gillikin, therefore, was justified in making known in this fashion his ability and desire to return to work. Although the record is silent as to whether the messages were actually received by the Hampton Roads Captain, we think that the important point is that Gillikin attempted to make known his availability for work. Testimony of the Company vice-president is to the effect that an injured employee is still considered an employee if he expresses a desire to return to work after recovery from his injury. Therefore, the Board properly considered Walton Gillikin to be on temporary sick leave and entitled to vote in the election.

### BERKLEY GILLIKIN and LEON T. ROSE

Berkley Gillikin was first employed by Respondent on the dredge Hampton Roads in August of 1955. During the next five years he was employed principally by Respondent, although subject to the usual pattern of layoff and recall. He was most recently employed on the Hampton Roads on April 11, 1961, and worked until May 1, 1961, when he was laid off with Vice-President Todd's promise that he would be recalled "after the election." Shortly after May 1, the Hampton Roads began a new dredging job, but Berkley Gillikin was not recalled and accepted a permanent job with Construction Aggregates on May 5, 1961, the day following the election.

Leon T. Rose was first employed by Respondent in the early part of 1960 on the dredge Hampton Roads and thereafter experienced several layoffs and recalls. Rose was laid off in February of 1961, but was recalled on April 15 and then laid off again on May 1. Thus, like Berkley Gillikin, Rose was employed by Respondent neither on the eligibility date, April 1, nor on the date of the election, May 4. On May 1, however, he was told by Dewey Merrill, Company Superintendent, that the laid off Hampton Roads employees would be called back after the election and to leave word as to how he could be contacted. Rose was not recalled and was employed by another firm two days after the election.

Hugh Brown, Willie B. Brown, Donnie Gillikin, Hampton Leonard, Eldred Robinson, R. D. Sellers, and C. R. Dixon, Jr.

These seven men, with varying records of previous employment with Respondent, were all discharged by Respondent upon completion of the dredging project at Wilmington, North Carolina, by the dredge Enterprise on April 29, 1961. Each of these men was employed on the eligibility date of April 1, but was not employed on the day of the election, May 4. At the time of the April 29 layoff, however, the crew was told by Assistant Superintendent Masich or by Captain Norman Gillikin, either that the job was completed and that they would be laid off and called back when work was available, or when other dredges had work, or be transferred to the dredge Hampton Roads. The eligibility list prepared by Respondent for the election on May 4, however, excluded sixteen of the Enterprise crew members, describing them as "employees who worked during the payroll period ending April 1, 1961, whose employment has terminated: Job completed."

 In view of the above mentioned assurances by responsible company officials to Berkley Gillikin and Leon T. Rose and to the seven former crew members of the Enterprise we find support for the Board's determination that these nine men were temporarily laid off and at the date of the election held a reasonable expectation of reemployment within a reasonable time in the future. Questions of eligibility frequently arise where the nature of the enterprise produces intermittent employment. In such enterprises, potential employees not working at the time of a representation election are often given the right to vote. The reason for this practice is clear. As stated by Judge Swan in Marlin-Rockwell Corp. v. N. L. R. B., 116 F.2d 586, 588 (2 Cir. 1941):

"A man who is laid off with reasonable expectation of being called back as soon as the employer's business picks up may well be concerned in the working conditions to which he will probably return and feel a lively interest in the selection of a collective bargaining representative. It is not unreasonable to include such a man in the voting unit."

The Fourth Circuit has upheld Board decisions which permitted unemployed seasonal employees to vote where they "had at the time of the election a reasonable expectation of reemployment within a reasonable time in the future." N. L. R. B. v. Jesse Jones Sausage Co., 309 F.2d 664, 665 (4 Cir. 1962). Respondent would have us give too narrow an interpretation to the Jesse Jones Sausage case and limit its application to seasonal industries where employees have a reasonable expectation of reemployment at a specific time in the future. There is nothing in the language or logic of the case to so restrict its application. Other Circuits have extended its rationale to sporadic as well as seasonal employment. See, e. g., Whiting Corp. v. N. L. R. B., supra; Marlin-Rockwell Corp. v. N. L. R. B., supra. The Board also recognizes that sporadic as well as seasonal employees should be permitted to vote in representation elections. See, e. g., Scoa, Inc., 52 LRRM 1244 (1963) (on call floaters of retail department store); Independent Motion Picture Producers Ass'n, 44 LRRM 1265 (1959) (musicians); Sucesores de Abarca, 31 LRRM 1096 (1952) (shipboard employees performing services as mechanics, welders, and laborers), L. Antonsanti, Inc., 30 LRRM 1468 (1952) (construction and maintenance employees).

Respondent's hiring history indicates that it usually recalls workers with previous experience as dredging contracts are obtained. The dredging business is subject to fluctuation; yet Respondent continues operations and has not seen fit to liquidate. Thus, the number of workmen to be required at a given future date is uncertain, but the probabilities are that some unknown number will be employed. In this situation, Respondent's employees have made the necessary adjustments. When laid off by Respondent they seek employment with other

dredging companies, turn temporarily to employment in other fields, or go on relief.

Respondent's employees are largely drawn from tidewater Virginia and North Carolina, and consider dredging their primary occupation. Although there is no seniority system with regard to layoffs and recalls, Respondent and its employees apparently have evolved an unofficial understanding that men with previous experience who live in the area will be recalled as jobs become available. This tacit understanding was made explicit in the present case by Respondent's officials indicating to nine discharged employees that their layoff was temporary and that they would be rehired. Although no such indication was made to Walton Gillikin, we think that he remained in an employee status while allowing an injury received on the job to heal. Walton Gillikin was sent to a doctor by his Captain and was told to, stay home until the broken finger mended. His informal, but customary, message sent to Respondent's officials attempting to inform them of his readiness to return to work served to reaffirm the continuing employee-employer relationship.

Respondent advances another argument in its attempt to invalidate the election. Citing the Marlin-Rockwell case, supra, Respondent suggests that because Berkley Gillikin and R. D. Sellers were employed by other concerns on the day of the election their votes should not have been counted. While it is true that an employee who has accepted *permanent* employment elsewhere on the day of an election may not vote, Morenci Corp., 30 LRRM 1403 (1952), no such situation existed here as regards these two men.

Berkley Gillikin, contrary to Respondent's contention that he was a regular, full time employee of Construction Aggregates as of May 4, 1961, was not employed by that concern until May 5.[2] The record is less clear as to the employment status of R. D. Sellers. From the record we are unable to say whether he was employed elsewhere as of May 4, 1961, or later, and to determine whether such other employment was temporary or permanent.[3] Lacking a more definite

2. Although the following testimony indicates that Berkley Gillikin was uncertain as to the *date* of the month that he started working for Construction Aggregates, it is apparent that he was certain as to the *day*, i. e., a Friday. The fifth of May in 1961 fell on Friday.

"Q. After that job (on the Hampton Roads) was completed, you came with the dredge back to Norfolk? A. (Berkley Gillikin) Yes, sir.

"Q. And then you were laid off, is that correct? A. I was laid off with the understanding that we would be notified Thursday or Friday whether we would be called back to work, or what to do.

"Q. And before that Thursday or Friday, you went to work for Construction Aggregates, is that correct? A. No, sir.

"Q. You went to work for Construction Aggregates May 4th? A. That was on Friday, wasn't it?

"Q. Was that on Friday? A. Yes, sir.

"Q. So on the Thursday or Friday following the Saturday in which you last worked, is that correct, Saturday is the last day you worked? A. Saturday was the last day I worked for Atkinson Dredging Company.

"Q. Yes. (69) A. That was the last day I work for Atkinson.

"Q. *And the following Friday you went to work for Construction Aggregates, is that correct? A. Yes, sir.*" (Emphasis added.)

3. "Q. Are you working at the present time? A. (R. D. Sellers) Yes, sir, I am with the Norfolk Dredging Company now.

"Q. When were you first employed with the Norfolk Dredging Company? A. Well, I don't recall exactly. It was a month and a half to two months later.

"Q. A month and a half to two months after your lay-off on April 29, 1961? A. Yes, about then.

\* \* \* \* \*

"(Hearing Officer) Were you working anywhere else during that two months' period?

"(The Witness) *I worked with Construction Aggregates a couple of weeks, just before—it was after the lay-off.*

"Q. That would be in June, some time in June, 1961? A. *I can't recall exactly when it was, it was about a month after I got laid off.*" (Emphasis added.)

**164**

record, we are unable to say that the Board incorrectly determined this man to be temporarily laid off and without permanent employment elsewhere at the time of the election. In this instance, the burden is on Respondent to show that the Board determination of eligibility was erroneous, not on the Board to prove it correct. Cf. N. L. R. B. v. Huntsville Mfg. Co., 203 F.2d 430 (5 Cir. 1953).

■ Respondent introduced evidence that several other employees who were permitted to vote were employed elsewhere subsequent to the election, but as we stated in the Jesse Jones Sausage case: "developments after the election 'cannot color the picture as it stood on the critical date.' " Thus, even if these other employees obtained permanent jobs with companies other than Respondent subsequent to the date of the election, this fact would be irrelevant in determining the outlook for future employment with Respondent as it existed on May 4, 1961.

■ Respondent raises a final point. Officials of Respondent allegedly overheard Walton Gillikin, at the close of the hearing on challenges on September 28, 1961, ask Peter Buono, Business Representative of the Union, "Where is my money?" Although the Board's rules and regulations provide that objections to a representation election must be filed within a five day time limit prescribed by Sec. 102.69(a), 29 CFR 102.69(a), Respondent contends that since this statement was made some four months after the election, it could not have presented objections within the prescribed time limit. Respondent therefore earnestly contends that this court should remand this case and order the Board to give Respondent an opportunity to present further evidence on the validity of the election in accordance with the procedure established in N. L. R. B. v. Lord Baltimore Press, Inc., 300 F.2d 671 (4 Cir. 1962) and N. L. R. B. v. Poinsett Lumber & Mfg. Co., 221 F.2d 121 (4 Cir. 1955).

Respondent's position is that this remark warrants an inference that Walton Gillikin had been paid to vote for the union four months earlier. We think the Board committed no error in refusing to convene a hearing at Respondent's urgings. Unlike the employer in N. L. R. B. v. Lord Baltimore Press, Inc., supra, Respondent here did not demonstrate by its offer of proof before the Board that its evidence, if presented, would strongly tend to show that a bribe had been made to influence the outcome of the election. Respondent was not prepared to offer Walton Gillikin as a witness to substantiate its charges of misconduct and indeed, offered nothing in addition to the single remark, "Where's my money." We are not prepared to say that this remark, without more, raised "substantial and material factual issues" under Rules and Regulations Sec. 102.69(d) which would have required an investigation by the Board into the conduct of the election.

Enforcement ordered.