**NATIONAL POSTERS, INC.; National Litho, a Division of National Posters, Inc., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Baltimore Graphic Communications Union, Local No. 61–C, Intervenor.**

No. 88–2602.

United States Court of Appeals, Fourth Circuit.

Argued April 11, 1989.

Decided Sept. 13, 1989.

Maurice Baskin (Rosemarie Schmidt, Venable, Baetjer, Howard & Civiletti, Washington, D.C., on brief), for petitioners.

Marsha S. Berzon (Jeffrey B. Demain, Altshuler & Berzon, San Francisco, Cal., Laurence Gold, Sandra Hughes, O'Donnell, Schwartz & Anderson, Washington, D.C., on brief), for intervenor.

Joseph Henry Bornong (Rosemary M. Collyer, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Washington, D.C., Deputy Associate Gen. Counsel, Paul J. Speilberg, Deputy Asst. Gen. Counsel, on brief), for respondent.

Before ERVIN, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.

ERVIN, Chief Judge:

National Posters Inc. ("NPI"), petitions for review of a bargaining order issued by the National Labor Relations Board ("NLRB"). NPI presses several arguments in support of a claim that it should not be required to recognize the Baltimore Graphic Communications Union, Local 61–C

("Local 61–C") as the collective bargaining agent for its employees. Finding no merit in any of these arguments, we grant enforcement of the NLRB's order.

I.

NPI is a commercial poster printer that employed over fifty people at two Baltimore plants during 1981. During that year, the predecessor to the Local 61–C, the Baltimore Printing Pressmen and Assistants Union, Local 61 ("Local 61"), conducted a bitter organizing campaign. On December 15, 1981, a representation election was held for the stipulated bargaining unit which included NPI's production and maintenance workers. The initial vote tally revealed 24 votes in favor of Local 61 and 21 votes opposed, with three ballots challenged by Local 61 and one ballot challenged by NPI. Without holding a hearing, the NLRB's Regional Director rejected NPI's challenge to the ballot cast by Samuel John. John's ballot was subsequently opened and counted. Since it was cast in favor of the union, his ballot gave the union a decisive 25 to 21 majority and the three remaining ballot challenges became moot. Local 61 was thereafter certified and on December 10, 1982, the NLRB issued an order requiring NPI to bargain collectively with Local 61.

This is the second time the parties' disputes over the results of that election have been before us. In *National Posters Inc. v. N.L.R.B.*, 720 F.2d 1358 (4th Cir.1983) ("*National Posters I*"), we vacated the NLRB's December 10th bargaining order because the NLRB's Regional Director rejected NPI's challenge to John's ballot without affording NPI the opportunity for a hearing on the underlying factual issues.[1] On remand, Administrative Law Judge Bernard Ries conducted a hearing on NPI's and Local 61's ballot challenges. After hearing three days of testimony in June of 1984, Ries issued a lengthy opinion in which he found that John was eligible to

---

**1.** For reasons not pertinent here, we also instructed the NLRB to allow NPI to amend its allegations of election campaign misrepresenta-

tions by Local 61. *National Posters I,* 720 F.2d at 1364. NPI subsequently abandoned these allegations and the issue is no longer before us.

vote. He also found that among the ballots challenged by Local 61, Wesley Souders was eligible to vote and Albert Amend was not. After an unexplained two year delay, the NLRB adopted ALJ Ries' decision. On NPI's motion, though, the NLRB reopened the hearings in light of the intervening merger of the International Printing and Graphic Communications Union (Local 61's former national affiliate) with the Graphic Arts International Union. As a result of this merger, Local 61 adopted its current name as the Baltimore Graphic Communications Union, Local 61–C. NPI charged that this merger substantially changed the local union and therefore raised a question concerning the local union's continued majority status among bargaining unit employees.

ALJ Ries conducted a second hearing in July of 1987. In an opinion issued in February of 1988, he concluded that the merger did not so substantially change the local union as to require its decertification as the bargaining representative for NPI's employees. On June 30, 1988, the NLRB adopted ALJ Ries' findings and declined NPI's invitation to reopen the case yet again to consider whether turnover among employees in the bargaining unit during the seven years since the election required a new election. Continuing its all out efforts to avoid the bargaining table, NPI now petitions for review of each and every decision by the NLRB recounted above.

## II.

We turn first to NPI's claim that the NLRB erroneously found that John was eligible to vote in the representation election. John worked at NPI off and on for roughly six months prior to the representation election as an on-call "racker" in the silk screen department. Unlike NPI's regular "rackers", John was only paid the minimum wage and received no fringe benefits. His time cards show that some weeks he worked over forty hours while during other weeks he did not work at all.[2] For purposes of determining voter eligibili-

ty, the NLRB distinguishes between part-time employees and seasonal or casual workers. Seasonal workers are generally not eligible members of the relevant bargaining unit, while part-time employees may be included in the bargaining unit if they share a sufficient "community of interests" with full time employees. Where part-time employees are included in the bargaining unit, such employees are eligible to vote if they average four hours of work per week in the quarter preceding the election. *V.I.P. Movers, Inc.*, 232 NLRB 14, 97 LRRM 1498 (1977). Applying this objective hours per week test, ALJ Ries found that John was an eligible part-time employee.

NPI does not contest the propriety of including part-time workers in the bargaining unit. Instead, it contends that John was a casual or seasonal employee hired solely to work for the 1981 Christmas peak season. According to NPI, John was not a part-time worker and therefore the objective hours test was erroneously applied. Further, NPI argues that this conclusion is compelled by the law of the case. In our previous decision, we noted that NPI had made out a prima facie case that John was a seasonal employee by alleging:

(1) [NPI] experienced a Christmas peak season; (2) [NPI] maintains a pool of peak season employees; (3) John was hired to work only on a peak season basis; (4) John was paid less than and received none of the benefits available to full-time employees and had no assurance of recall; and (5) John, in fact, worked primarily during the Christmas peak season and stopped work thereafter.

*National Posters I*, 720 F.2d at 1363. NPI now claims that evidence produced at the June 1984 hearing before ALJ Ries proved each of these allegations and thus, according to the law of the case, the ALJ was required to find that John was ineligible.

■ This argument is unpersuasive for two reasons. First, as discussed more fully below, ALJ Ries did not find that NPI

---

2. John's weekly hours from the date of his hiring up until two weeks after the election are

reproduced in our prior opinion in *National Posters v. N.L.R.B.*, 720 F.2d, at 1359, n. 1.

had proved all of its allegations. Second, by expressly noting NPI's allegations, we in no way intended to alter the legal standard for determining whether John was a seasonal or part-time employee. Instead, we merely noted NPI's allegations were sufficient to raise a prima facie case and entitle NPI to a hearing. We explicitly stated that "other facts might tend to support the Regional Director's conclusion [that John was a part-time employee and], whether that conclusion is supported by substantial evidence is a question apart from whether [NPI] was entitled to a hearing on the underlying factual issue." *National Posters I*, 720 F.2d at 1363. Thus even if NPI had proved each of its allegations, ALJ Ries was not bound by the law of the case to conclude that John was a seasonal worker so long as other evidence supported a contrary conclusion. The "law of the case" here is of no particular assistance to NPI's cause for it merely requires us to review the NLRB's decision according to the general principles of labor law.

Distinguishing between seasonal and part-time employees is no easy task. *See N.L.R.B. v. Western Temporary Services*, 821 F.2d 1258 (7th Cir.1987). Addressing issues regarding the eligibility of non-permanent individual employees, courts have commonly looked to the language defining the bargaining unit and, where that language was ambiguous, allowed the NLRB to resolve the issues according to the "community of interests" standard. *See, e.g., N.L.R.B. v. Boston Beef*, 652 F.2d 223 (1st Cir.1981); and *N.L.R.B. v. Speedway Petroleum*, 768 F.2d 151 (7th Cir.1985). *See also I.T.O. Corp. of Baltimore v. N.L.R.B.*, 818 F.2d 1108, 1112–13 (4th Cir.1987) (discussing "community of interests" standard generally). Applying this standard, "[t]he Fourth Circuit has upheld [NLRB] decisions which permitted unemployed seasonal employees to vote where they 'had at the time of the election a reasonable expectation of reemployment within a reasonable time in the future.'" *N.L.R.B. v. Atkinson Dredging*, 329 F.2d 158, 162 (4th Cir. 1964), *quoting N.L.R.B. v. Jesse Jones Sausage Co.*, 309 F.2d 664, 665 (4th Cir. 1962). The NLRB's policy is that on-call

employees share the requisite "community of interests" if their work history satisfies the objective hours test. *See V.I.P. Movers*, 232 NLRB 14, 97 LRRM 1498 (1977).

The ALJ's determination of John's employment status at NPI is a conclusion of law. *National Posters I*, 720 F.2d at 1362–63. The correctness of that conclusion turns, however, upon factual findings regarding NPI's intention in hiring John. *See Id.* As suggested in *National Posters I*, if NPI hired John "based on the periodic availability of work rather than on peak season demand," John was eligible to vote. *Id.*, at 1363. NLRB determinations of fact are to be upheld if supported by substantial evidence on the record as a whole, "even though we might have decided the case differently de novo." *ARA Leisure Services, Inc. v. N.L.R.B.*, 782 F.2d 456, 462 (4th Cir.1986). *See also N.L.R.B. v. Atkinson Dredging Co.*, 329 F.2d, at 162.

ALJ Ries' decision that John was hired with a reasonable probability of working on more than a one-time seasonal basis is supported by substantial evidence. NPI's Treasurer, Diane Hild, testified that the company maintained a pool of on-call individuals who were routinely called in to work as temporary replacements for sick or vacationing workers in addition to helping fulfill peak season labor needs. She also stated that NPI preferred to rehire responsible people from its "call list" and that "call list" employees were sometimes hired to fill full-time positions. John was on this list for the six months preceding the election. The record reveals that John was hired to perform several different jobs prior to the election and that NPI appeared to be satisfied with his work. Hild testified that John was retained on the "call list" after the Christmas, 1981, season. She could not explain, however, why his name was removed from the list shortly after the election. This evidence provides substantial support for the ALJ's finding that John had a reasonable expectation of continued, albeit sporadic, employment and that he was therefore eligible to vote. According-

ly, we uphold the NLRB's decision to count John's ballot and to certify Local 61.[3]

### III.

■ Changes in circumstances may erode employee support for a certified bargaining agent. For this reason, the NLRA allows both employees and employers to petition the NLRB to conduct new representation elections. *N.L.R.B. v. Financial Institution Employees*, 475 U.S. 192, 198, 106 S.Ct. 1007, 1010, 89 L.Ed.2d 151 (1986), 29 U.S.C. § 159(c)(1)(A)(ii) (petition by employees), and 29 U.S.C. § 159(c)(1)(B) (petition by employer). The NLRB may then direct a new election if, after investigation, it finds that a question of representation exists. 29 U.S.C. § 159(c). In order to raise a question of representation, "[t]he employer, however, must 'demonstrate by objective considerations that it has some reasonable grounds for believing that the union has lost its majority status.'" *Financial Institution Employees*, 475 U.S. at 198, 106 S.Ct. at 1010, *quoting United States Gypsum Company*, 157 NLRB 652, 656 (1966). A union reorganization, such as a merger or a change in affiliation, may erode rank and file support, especially if the reorganization "substantially change[s] a certified union's relationship with the employees it represents." *Id.*, at 202, 106 S.Ct. at 1012. In most instances, however, organizational adjustments are generally internal union affairs with which neither courts nor the NLRB should lightly interfere.

NPI claims that the July, 1983, merger of the International Printing and Graphic Communications Union ("IPGCU") with the Graphic Arts International Union ("GAIU") to form the Graphic Communications International Union (the "GCIU") raises a question of representation. As noted above, this reorganization merged Local 61's former national affiliate into a newly created national affiliate, the GCIU. NPI argues that this merger brought about such drastic changes that the substantial continuity of Local 61 with the current Local 61–C is in doubt.

In determining whether reorganizations "substantially change a certified union's relationship with the employees it represents," courts and the NLRB typically consider the effect on a local union's structure, administration, officers, assets, craft jurisdiction, autonomy, by-laws, and the rights and obligations of the union's membership and leadership. *See N.L.R.B. v. Pearl Bookbinding*, 517 F.2d 1108, 1111–12 (1st Cir.1975); *J. Ray McDermott & Co. v. N.L.R.B.*, 571 F.2d 850, 857 (5th Cir.1978); and *N.L.R.B. v. Insulfab Plastics*, 789 F.2d 961, 966 (1st Cir.1986). Whether corporate-style reorganizations of unions and their affiliates so substantially change a union that a new representation election is required depends on factual determinations of the effects of reorganization. *See N.L.R.B. v. Insulfab Plastics*, 789 F.2d at 966. And of course, the NLRB's determinations of the effects of such reorganizations must be upheld if supported by substantial evidence.

NPI strenuously argues that several differences between the structure, officers, and craft jurisdiction of the IPGCU and the new GCIU have transformed Local 61. Specifically, NPI points to the fact that GCIU's charter expands the union's craft jurisdiction beyond the printing industry, and most of the new union's national officers are former officers of GAIU rather than IPGCU.[4] The ALJ, however, dis-

---

**3.** NPI also challenges the ALJ's decision that Albert Amend was a supervisor and therefore ineligible to vote. Having affirmed the ALJ's decision regarding John, it is unnecessary for us to review Amend's eligibility. Once counted, John's ballot brings the vote tally to 25 in favor and 21 opposed to unionization. The three remaining challenged ballots can not alter the outcome of the election and we see no purpose in reviewing the merits of those challenges.

**4.** NPI also challenges the ALJ's refusal to grant a delay in the hearings so that NPI could subpoena GCIU Vice–President James J. Mitchell. Mitchell was formerly an IPGCU officer. We find no harm in the fact that NPI was unable to present Mitchell's proffered testimony regarding the existence of a conspiracy on the part of former GAIU officers to dominate the new GCIU to the exclusion of former IPGCU officers, and to ignore provisions of the merger agreement. We see little relevance in this proffered

counted the effect of these and other changes at the national affiliate level and instead focused his inquiry on changes at the local level and alleged changes in Local 61's autonomy. This decision was entirely appropriate on the facts of this case. Local 61 was the former representative for NPI's unit employees and differences between Local 61 and Local 61–C clearly have the most dramatic effect on the relationship between unit employees and their representative. While changes in the governing structure of a local union's national affiliate could alter the identity of the local, especially if the local's bargaining autonomy is consequently restricted, it is the substantial continuity of the local union rather than the affiliate that remains at issue. *See Financial Institution Employees,* 475 U.S. at 207, 106 S.Ct. at 1015.

Turning, then, to the asserted differences between Local 61 and Local 61–C, we find that the record strongly supports the ALJ's conclusion that these differences were minor or illusory. In several important areas, the merger brought no changes. All of Local 61's officers except one vice-president retained their offices in Local 61–C. Local strike action had to be approved by the national both before and after the merger. And per capita dues to the affiliate remained unchanged by the merger. After the merger, Local 61–C did relocate its offices and did raise local dues, but this dues increase was proportional to pre-merger dues increases. These changes were, at best, only tangentially related to the merger. Other changes noted by NPI hardly call rank and file support into question. At GCIU's instruction, Local 61–C obtained new legal counsel and, as a result of the merger, local assets and revenues rose moderately.

On these facts, we can hardly say that NPI has "demonstrated by objective considerations" that Local 61–C has lost majority support. Thus the ALJ's decision that NPI has not raised a question of representation must be upheld.

testimony to the issue of substantial continuity

## IV.

■ Finally we turn to NPI's assertion that it was entitled to have the hearings reopened so that it could present evidence that employee turnover since the 1981 election required a new election. NPI points out that its work force has grown to over 130 employees and that 18 of the original 55 workers have left the company since the election. NPI suggests that under precedent established in *St. Regis Paper Co,* 285 NLRB No. 39, 126 LRRM 1017 (1987), the NLRB was required to consider whether employee turnover and the inordinate delay since the election constitute changed circumstances which warrant a withdrawal of the bargaining order. NPI also urges that the eight year delay was solely the NLRB's fault and that we should therefore deny enforcement rather than remanding the case for further hearings.

Courts have, albeit rarely and in extreme cases, declined to enforce bargaining orders because of undue delay, attributable to the NLRB, in the resolution of election disputes. *See Mosey Mfg. Co. v. N.L.R.B.,* 701 F.2d 610 (7th Cir.1983). And in some cases, courts have noted that employee turnover during such delays may call into question the continuing validity of close election results. *See N.L.R.B. v. Katz,* 701 F.2d 703 (7th Cir.1983); *N.L.R.B. v. Nixon Gear, Inc.,* 649 F.2d 906 (2nd Cir.1981); *N.L.R.B. v. Connecticut Foundry Co.,* 688 F.2d 871 (2nd Cir.1982) In most of these decisions, the refusal to enforce bargaining orders was justified on traditional principles of equity. *See, e.g., Mosey Mfg. Co.,* 701 F.2d, at 613 ("When a party asking a court to do equity has strung out the proceeding to the point where the court cannot determine whether equitable relief would achieve the legitimate purposes of the suit ... the court will withhold its assistance."). On this authority, NPI argues that employee turnover and NLRB delays in deciding this case justify denying enforcement of the NLRB's bargaining order.

Unlike the delays in the cases relied upon by NPI, we hesitate to lay the entire blame for the eight year delay in the proceedings between Local 61 and Local 61–C.

below on the NLRB.[5] Without attempting to further distinguish the decisions of our sister circuits, though, we hold that NPI's challenge must be analyzed under the principles set forth in *Financial Institution Employees, supra,* rather than the principles of equity. In other words, employee turnover, just like a union reorganization, is a change in circumstance of no particular consequence unless it raises a question of representation. And again, to raise a question of representation, NPI must "demonstrate by objective considerations that it has some reasonable grounds for believing that the union has lost its majority status." *Financial Institution Employees,* 475 U.S. at 198, 106 S.Ct. at 1010.

NPI's only evidence, however, is the bare fact that employee turnover has occurred during the eight years since the election. This, without more, is insufficient to raise a question of representation. *Cf. Universal Security Instruments Inc., v. N.L.R.B.,* 649 F.2d 247, 255 (4th Cir.1981) ("Replacement employees are presumed to support the unit in the same ratio as those replaced."), and *N.L.R.B. v. 1199, National Union of Hospital and Health Care Employees,* 824 F.2d 318, 323 (4th Cir.1987) ("Where a union is certified after a representation election, the employer cannot challenge majority status until it has bargained with the union for a reasonable period, usually one year."). Indeed, the record is entirely devoid of evidence that new employees are dissatisfied with or otherwise opposed to Local 61–C's representation. Were we to adopt NPI's argument that it was entitled to a hearing on this evidence, we would effectively hold that the passage of time and employee turnover are sufficient to raise doubts about rank and file support. This we will not hold. Since NPI failed to present sufficient evidence to raise a question of representation, the NLRB properly declined to hold hearings on the issue of employee turnover.

**5.** We do note, however, that the NLRB's disposition of this case has been no model of administrative efficiency. Almost two and a half years elapsed after the first hearings on John's voting

### V.

We conclude that the record supports the NLRB's determinations that John was eligible to vote in the 1981 election and that the intervening merger of Local 61–C's former affiliate did not call into question Local 61–C's rank and file support. We also conclude that NPI's bare assertions of employee turnover did not necessitate further hearings and further delays in these already unduly protracted proceedings. The NLRB's order directing National Posters, Inc., to bargain with the Baltimore Graphic Communications Union, Local 61–C is hereby

ENFORCED.

eligibility and the NLRB's decision. No good reason for this delay has been offered by the General Counsel.