**EL TORITO–LA FIESTA
RESTAURANTS, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

Hotel Employees and Restaurant Employees Union, Local 100, of New York, New York and Vicinity, AFL–CIO ("Local 100"), Respondent–Intervenor.

**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**EL TORITO–LA FIESTA
RESTAURANTS,**
Respondent.

Nos. 89–70284, 89–70343.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 12, 1990.

Decided March 28, 1991.

H. Reed Ellis, DeMaria, Ellis & Hunt, Newark, N.J., for petitioner.

Laurence S. Zakson, N.L.R.B., Washington, D.C., for respondent.

Harold Ickes, Meyer, Suozzi, English & Klein, Mineola, N.Y., for respondent-intervenor.

Before HUG, BEEZER and BRUNETTI, Circuit Judges.

BEEZER, Circuit Judge:

El Torito petitioned for review of an order of the National Labor Relations Board (NLRB or Board) requiring it to recognize and to bargain with the Hotel Employees and Restaurant Employees Union, Local 100 (Union). We deny the petition and grant the Board's cross-application for enforcement.

I

The Howard Johnson Company owned and operated the Red Coach Grill in Yonkers, New York, until 1982. On May 15, 1981, Howard Johnson entered into a collective-bargaining agreement (CBA) with Hotel, Restaurant and Club Employees and Bartenders Union Local 6, covering dining room, bar and kitchen employees at the restaurant. The contract was effective from May 16, 1981 to January 15, 1986. In 1982, Howard Johnson sold the Red Coach Grill to Exeter Equities, which assumed the CBA.

Effective January 1, 1983, the International of the Hotel Union formed Local 100

to represent employees formerly represented by Local 6.

On May 6, 1983, Exeter sold the Red Coach Grill to El Torito–La Fiesta Restaurants, Inc. (El Torito or the Company). El Torito signed two agreements with Local 100 in which El Torito and the Union agreed to adopt the CBA between Howard Johnson and Local 6 and El Torito agreed to recognize Local 100 as the successor to Local 6 and as the collective-bargaining representative for the employees covered by the CBA. El Torito operated the Red Coach Grill and honored the CBA until December 31, 1983, when it closed the restaurant to remodel it into an El Torito mexican restaurant.

On March 4, 1985, the new El Torito restaurant opened. Eight of the original 80 or 90 Red Coach Grill bargaining unit employees were among the 180 to 200 El Torito restaurant employees. On March 5, Local 100 demanded that El Torito recognize it as the representative of the restaurant employees and apply the CBA. El Torito refused. After a hearing, an Administrative Law Judge (ALJ) determined that there was no continuity of representation between Local 6 and Local 100 and that El Torito did not violate the National Labor Relations Act (the Act) by refusing to recognize Local 100. However, the ALJ found that if there had been continuity of representation, the withdrawal and refusal to honor the CBA would have violated sections 8(a)(1) and (5) of the Act.

On review, the NLRB held that El Torito was estopped from challenging Local 100's representation of the employees by virtue of the agreements El Torito entered into with Local 100. The Board also held that the CBA barred El Torito from challenging Local 100's majority status at the time El Torito withdrew recognition. The Board thus found violations of sections 8(a)(1) and (5) of the Act and ordered El Torito to recognize the Union and to bargain with it on request, as well as to make the employees whole for any loss of wages or benefits.

El Torito petitioned this court for review and the Board filed a cross-application for enforcement of its order. We found substantial evidence to support the Board's determination that El Torito was estopped from challenging Local 100's assumption of Local 6's representational rights, but remanded for clarification of the decision that the CBA barred El Torito from challenging Local 100's majority status. 852 F.2d 571. We were concerned that the case might be an appropriate one for the application of one of the exceptions to the Board's contract bar rule, recognized in *General Extrusion, Co., Inc.*, 121 NLRB 1165 (1958), *Montgomery Ward & Co., Inc.*, 137 NLRB 346 (1962), 1962 CCH NLRB 17,500, and *Harte & Co.*, 278 NLRB 947 (1986). We remanded to the Board for reconsideration or clarification of its decision.

The Board reaffirmed its decision that the Union enjoyed an irrebuttable presumption of majority status during the term of its CBA with El Torito, and reaffirmed its order. El Torito petitioned for review and the NLRB filed a cross-application for enforcement of its order.

## II

■ An employer may not "interfere with, restrain or coerce employees" in the exercise of their rights to act collectively, and may not "refuse to bargain collectively with the representatives of his employees." National Labor Relations Act, § 8(a)(1), (5), 29 U.S.C. § 158(a)(1), (5) (1988). Under the contract bar rule, once an employer and a union enter into a valid collective-bargaining agreement, the majority status of the union is presumed for the duration of the contract, not to exceed three years. *Westwood Import Co. Inc. v. NLRB*, 681 F.2d 664, 666 (9th Cir.1982) (citations omitted). The rule is designed "to promote industrial stability between contractual partners and to afford employees a reasonable opportunity to change or eliminate their bargaining representative." *East Mfg. Corp.*, 242 NLRB 5, 6 (1979). In order to protect the bargaining atmosphere, the rule is applied "even if a majority of the employees withdraw their support." *Pioneer Inn Associates v. NLRB*, 578 F.2d 835, 838 (9th Cir. 1978) (citation omitted).

Because the contract bar rule is not statutorily or judicially mandated, but is instead a creation of the Board, the Board has broad discretion to apply or waive the rule "in order to effectuate its policy underpinnings." *NLRB v. Circle A & W Products Co.*, 647 F.2d 924, 926 (9th Cir.), *cert. denied*, 454 U.S. 1054, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981). However, the Board must explain its decisions so that a reviewing court can "determine whether it attempted to effectuate these policies in a reasoned and deliberate manner." *Bob's Big Boy Family Restaurants v. NLRB*, 625 F.2d 850, 852, 853–54 (9th Cir.1980). We will not enforce an NLRB order that clearly departs from the Board's own standards or that is based on standards that are themselves invalid. *NLRB v. Buckley Broadcasting Corp.*, 891 F.2d 230, 232 (9th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 2619, 110 L.Ed.2d 640 (1990). Additionally, "[w]here the objectives of contract stability and adequate employee representation conflict, the Board must exercise its discretion to reach an appropriate balance, but it must give explicit recognition to both sides of the balance." *Circle A & W*, 647 F.2d at 926.

The Board has recognized an exception to the contract bar rule where, after an indefinite period of closing, an employer resumes operations with new employees. *General Extrusion Co., Inc.*, 121 NLRB at 1167. In *Montgomery Ward*, 137 NLRB 346, 1962 CCH NLRB 17,500, the employer terminated its retail operations and reopened two days later as a catalog store with 14 employees, all of whom were members of the original bargaining unit of 52 employees. The Board noted that the new operations required no more than two months of employee instruction. The Board then stated:

> While there are differences between the two types of operation, these differences appear primarily to concern the employer's administration, rather than its labor relations.... [W]e find that there has not been a sufficiently substantial

change in either the employer's operations or the character of the bargaining unit to remove the contract as a bar. *Id.* at 350–51, 1962 CCH NLRB at 17,503.

In the present case, the changes in El Torito's operations were cosmetic, but there was a substantial change in the employees who made up the bargaining unit. Nevertheless, the Board held that the contract bar rule applied. The Board cited the temporary nature of the shutdown and a reasonable expectation of reemployment on the part of the employees as evidence that the bargaining unit remained intact through the hiatus in operations. These are appropriate factors to consider because they suggest the understanding of both the employer and the employees that the positions by which the bargaining unit is defined will continue to exist upon resumption of the employer's operations.

Because a union has the exclusive right to represent a bargaining unit that has selected that union as its representative, *see* National Labor Relations Act § 9(a), 29 U.S.C. § 159(a) (1988), the essential factor in finding a valid CBA to be a bar after a shutdown in operations is the continuing existence of the bargaining unit. *See Coastal Cargo Co.*, 286 NLRB 200, 204 (1987), 1987–88 CCH NLRB 32,681, 32,684–85 (The CBA was a bar because the temporary nature of the shutdown indicated that "the bargaining unit continued at all times relevant to this proceeding"). A bargaining unit "is comprised of jobs or job classifications and not of the particular persons working at those jobs at any given time." R. Gorman, *Labor Law* 66 (1976). Thus a change in the character of the work done will suggest that the bargaining unit did not remain intact, whereas a change in the individual workers will not necessarily imply the same thing.[1] *Cf. General Extrusion*, 121 NLRB at 1167–68, 42 BNA LRRM at 1510 (the transfer of a considerable portion of the employees to a new location, "without an accompanying change in

---

1. The fact that the Board expressly considered *Montgomery Ward* in reaching its conclusion that the CBA acted as a bar to El Torito's at-

tempt to avoid dealing with the Union indicates that the Board recognized this distinction.

the *character of the jobs and the functions of the employees in the contract unit,* does not remove a contract as a bar") (emphasis added). This is consistent with the principle that new employees are presumed to support the union "in the same proportion as those employees with more seniority." *Pioneer Inn Associates*, 228 NLRB 1263, 1266 (1977), *enf'd*, *Pioneer Inn*, 578 F.2d 835 (9th Cir.1978) (citation omitted).[2]

El Torito cites *Harte* for the proposition that the Board will not find a CBA to be a bar where a significant number of the individual employees are different after the resumption of operations. In *Harte*, the employer transferred its operations to a new location 32 miles from its original site. The Board held that

> an existing contract will remain in effect after a relocation if the operations at the new facility are substantially the same as those at the old and if transferees from the old plant constitute a substantial percentage—approximately 40 percent or more—of the new plant employee complement.

*Id.* at 948 (citations omitted).

In the present case, the Board distinguished *Harte* and explained its rationale for applying the contract bar rule even though most of the employees in the bargaining unit are no longer the same. The Board explained that "when faced with the uncertainties stemming from a temporary shutdown of operations, a union and the employees it represents need the protections afforded by an existing collective-bargaining agreement if the national labor policy of industrial peace is to be furthered." However, the need for the protection provided by the contract bar rule is not as great where the temporary shutdown is for

the purpose of relocating, as it was in *Harte*, because

> a relocation, by definition, involves a new work situs and a greater likelihood of significant changes in the composition of the work force due to the possible unwillingness of employees to transfer to the new facility. Thus the Board developed the 40–percent rule in relocation cases to ensure that the rights of the new employees and the transferees would be properly balanced.

Additionally, the Board was concerned that if the exception to the contract bar rule in the case of a temporary shutdown were not limited to relocations, employers would be able to "readily escape their collective bargaining obligations without justification by merely instituting a temporary shutdown of operations." [3]

El Torito also argues that because new employees have an interest in choosing their representatives, a significant change in the composition of the bargaining unit must always be taken into account if the Board is to satisfy its obligation to consider the statutory objective of employee freedom of choice. The Board noted, however, that El Torito's employees are not indefinitely bound to having Local 100 represent them; they may, if they wish, file a petition for decertification. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1967).

In light of these considerations, the Board determined that the contract bar rule does apply where a shutdown is temporary and the character of the work done by the bargaining unit remains the same. This application is consistent with the Board's prior decisions and adequately takes into account both statutory objec-

---

**2.** That presumption may be overcome by a showing of either "(1) lack of actual majority status or (2) a good faith doubt of majority status." *See NLRB v. Vegas Vic, Inc.*, 546 F.2d 828, 829 (9th Cir.1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977).

**3.** A successor employer who has not assumed a CBA entered into by the predecessor employer has a duty to bargain with the union only if a majority of the employees in the bargaining unit

are former employees of the predecessor employer. *Burns v. Int'l Secur. Servs., Inc.*, 406 U.S. 272, 281, 92 S.Ct. 1571, 1579, 32 L.Ed.2d 61 (1972); *Pacific Hide & Fur Depot, Inc. v. NLRB*, 553 F.2d 609, 611 (9th Cir.1977). However, the successorship situation is different from a shutdown and resumption of operations by the same employer, because successorship cannot be used by an employer to avoid his bargaining obligations.

tives. The Board did not abuse its discretion in applying the contract bar rule.

## III

■ El Torito also challenges the Board's findings that the shutdown was temporary, and that the employees had a reasonable expectation of reemployment. This court will enforce an order of the NLRB if the order correctly applies the law and if its findings of fact are supported by substantial evidence on the record as a whole. *Buckley Broadcasting,* 891 F.2d at 232; *see also* 29 U.S.C. § 160(e) (1988). Where there are two fairly conflicting views of the evidence, a factual determination by the Board must be upheld " 'even though the court would justifiably have made a different choice had the matter been before it *de novo.*' " *M.W. Kellogg Constructors, Inc. v. NLRB,* 806 F.2d 1435, 1438 (9th Cir.1986) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)).

El Torito argues that a shutdown is indefinite whenever there is no set date for resumption of operations, whether or not the employer intended to resume operations. However, this position is not consistent with the Board's decision in *Coastal Cargo,* 286 NLRB 200 (1987), 1987–88 CCH NLRB 32,681, where the employer terminated operations and released its employees "for lack of work," but resumed operations 9 months later, when it again had work. *Id.* at 203, 1987–88 CCH NLRB at 32,684. Although there was no set date for resumption when the operations were terminated, the Board considered the termination temporary because the employer had solicited work during the hiatus in operations. *Id.*

■ In the present case, the Board found that the employees had a "reasonable expectation of reemployment" because they knew the shutdown of operations was only temporary and they "were told that they would be recalled when the restaurant reopened." [4] El Torito argues that there is not substantial evidence to support this finding.[5]

The ALJ's and the Board's finding of a reasonable expectation of recall was based on the following evidence.[6] When the Red Coach Grill was closed, El Torito intended to reopen it as a mexican restaurant after remodeling. The Union's business agent testified that the manager of the Red Coach Grill told him, before the shutdown, that "all the employees that were going to be laid off would be notified that they

4. The Board appears to consider a reasonable expectation of recall to be synonymous with a reasonable expectation of reemployment. For example, it cited *Sterling Processing,* 291 NLRB No. 30 (1988), as a case in which there was no reasonable expectation of reemployment, although the Board in *Sterling* discussed only the expectation of "recall." Likewise, some cases discuss the right of laid-off workers to vote in representation elections as depending on the employees' expectation of recall, *see, e.g., Atlas Metal Spinning Co.,* 266 NLRB 180 (1983), whereas others discuss the same factor in terms of the expectation of reemployment. *See, e.g., Windsor Woodworking, Inc. v. NLRB,* 647 F.2d 859, 861 (8th Cir.1981); *Kustom Electronics, Inc. v. NLRB,* 590 F.2d 817, 821 (10th Cir.1978); *NLRB v. Atkinson Dredging Co.,* 329 F.2d 158, 164 (4th Cir.), *cert. denied,* 377 U.S. 965, 84 S.Ct. 1647, 12 L.Ed.2d 736 (1964). Any distinction between recall and reemployment is irrelevant when the primary significance of the finding is to determine whether the bargaining unit remained intact.

5. The issue before the panel is not whether there is evidence of a recall, but whether this evidence supports a finding that there was a *reasonable expectation* of recall. The ALJ expressly noted that he did not believe the early interview and hiring of 14 Red Grill employees constituted a recall, but that he did feel that the conduct of El Torito did create a reasonable expectation of recall, which was sufficient to indicate continuity of the bargaining unit.

6. Neither the Board nor the courts have defined what constitutes a reasonable expectation of in the context of determining whether the obligation to bargain continues after a hiatus in operations. However, a reasonable expectation of reemployment is required if laid-off employees are to be given the right to vote in representation elections that occur during the time they are laid-off. *Windsor Woodworking, Inc.,* 647 F.2d 859, 861 (8th Cir.1981); *Kustom Electronics, Inc.,* 590 F.2d 817, 822 (10th Cir.1978). In this context, the Board identifies a reasonable expectation of recall by examining the employer's past experience and future plans, the circumstances of the layoff and what the employee was told about the likelihood of a recall. *Atlas Metal Spinning Co.,* 266 NLRB 180 (1983); *see also Kustom Electronics,* 590 F.2d at 822.

could come back to their job, that they could come back and reapply for their job" after the renovations were completed.[7] On August 23, 1984, El Torito sent a letter to the laid-off employees stating that the company would keep them informed of its progress with the renovations and would give them "details as to your recall procedures." On December 11, 1984, El Torito sent another letter to the laid off employees that stated:

> We also are enclosing a reply card for you to use to let us know your interest in working with us and how to contact you in connection with our staffing of the new El Torito. Please take the time to complete the card and return it to us. If we do not hear from you, we'll assume you are not interested.

Finally, On January 29, 1985, the Company sent a letter to the laid off employees that stated:

> As you may see from the ads in your local newspaper, interviews for applicants will begin ... February 5th. However, in view of your experience and interest we would like to meet with you prior to that date. If you are still interested in working at the El Torito–Yonkers, please come to the restaurant ... on February 4th.

The collective-bargaining agreement between El Torito and Local 100 provided that any recall of employees must be accomplished according to the seniority of the employees, but that employees laid off continuously for one year lose all seniority. El Torito argues that the employees of Red Coach Grill lost their seniority rights once they had been laid off for over one year, and thus they could not have had a reasonable expectation of reemployment during the whole of the hiatus in operations, which lasted for 14 months. The Company fails, however, to distinguish between the right of the individual employees to be recalled and the issue of concern here, which is

whether El Torito is required to recognize the Union and to abide by the terms of the agreement, including the provision regarding seniority, with respect to its present employees. El Torito's conduct with respect to its previous employees supports the Board's finding that there was a reasonable expectation of reemployment despite the seniority provision, which might in fact have terminated any right the employees had to be recalled. Furthermore, allowing an employer to avoid its obligations under a CBA simply by delaying resumption of operations after a temporary shutdown would defeat the purposes of the contract bar rule.

Although some of the evidence used by the Board to support its conclusion is susceptible to different interpretations, this fact is not enough to allow us to overturn the Board's conclusion. *See M.W. Kellogg,* 806 F.2d at 1438. Accepting the Board's reasonable interpretation of the evidence, there is substantial evidence supporting its finding that the bargaining unit remained intact after El Torito resumed operations.

The petition for review is DENIED; the application for enforcement is GRANTED.

---

**7.** El Torito argues that this statement is irrelevant to the issue of the employees' expectation because it was made to the business agent and there is no evidence that it was ever disclosed to any employees. However, a statement made to an agent of the employees' representative should be considered as having been made to

the employees. *See Medo Photo Supply Corp. v. NLRB,* 321 U.S. 678, 684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944) ("[I]t is a violation of the essential principles of collective-bargaining ... to disregard the bargaining representative by negotiating with the individual employees.").